Good morning, Your Honors. May it please the Court, I'm Stephen Barry of Denton's U.S. and I'm here for my client, American Guarantee. This is a subrogation dispute brought by an excess insurer against a primary insurer. The facts are pretty complicated so I'll presume that the Court read the briefs. I'll just jump to the heart of the facts. There's a sugar plant that exploded and there's a question about whether the people that were hurt were employees and thus subject to the workers' comp tort bar. And so you had a potential for dual coverage. You know, they were definitely covered by the workers' comp policy that AIG issued. They also had potential tort claims so they could be covered under the general liability tower of insurance that Imperial Sugar had. AIG issued the first $26 million of that tower as well. So in its dual capacity as primary GL insurer and workers' comp insurer, AIG controlled the settlement negotiations with all the people that were hurt. There it went to Imperial Sugar and got approval for a certain amount for each tort claim. Then it went to the plaintiffs and negotiated a lump sum which each plaintiff separately, some of those lump sums were unallocated, some of them were specifically allocated on the plaintiff's end. But then AIG went back without telling Imperial Sugar and reallocated those settlements, spiking most of the amounts into its GL coverage instead of its workers' comp coverage. And the settlements that had been allocated with the plaintiffs, AIG changed those without telling or asking anybody. The way they did this benefited AIG. It hurt Imperial Sugar. So tell me that. That's the interesting part of this, right? How did it hurt Imperial Sugar? It hurt Imperial Sugar in numerous ways. It had limited GL coverage. You need long-term GL coverage. Even now they need it for that policy period because you could have a long-term pollution loss or something. They had to go out and buy more insurance because they burned through their excess insurance to pay for these claims, which could have been settled under the primary insurance. Also, that primary policy had a duty to defend. And when AIG intentionally burned through that primary policy as fast as it could to extinguish that duty to defend, they're making Imperial Sugar have to start paying the lawyers to defend because the excess GL policies had a right but not the duty to defend. So your position is not that the subrogation claim survives even though the insured, by virtue of its excess insurance, didn't suffer a harm, but instead that the insured suffered a harm? Well, it's both. My primary point is that the fact that Imperial Sugar did not bear the brunt of these excess tort settlements because its excess insurers had to pay them doesn't mean there's no subrogation. That was the second mistake that the district court made. I'll skip to that. There's plenty of Georgia law on point that says if you have a loss and it's insured and the excess insurer pays for it, that's still a loss and the excess insurer has the right to seek subrogation. The best case for that is the Great American v. International Insurance Company case where you had primary limits of $500,000. The primary insurer breached its duty to get that case settled. They breached lots of duties, actually. You ended up having a $1 million settlement. Well, there was $2 million in excess coverage there. So the insured was never out of pocket. The excess insurer had to pay the excess settlement there. Are there cases that extend that principle beyond the failure to settle context into the group? Great question. As to AIG's duty to settle a case, it's not limited just to get a case settled. The Great American v. International Insurance Company case is the best example for that. We had the court finding the primary insurer breached its duty to settle in three ways, not just the duty to get it settled, but also in representing policy and coverage information to the insured and also its trial strategy. So it's an all-encompassing fiduciary duty. The best case on the fiduciary duty is the Home v. Winn case where a spouse—it's not an insurance case, but it's about a fiduciary duty there—a spouse settled a wrongful death claim. Then she became the executive for the estate and allocated those settlement proceeds among the beneficiaries. She had a fiduciary duty to allocate it properly. Nobody questioned the amount of the tort settlement, and it's similar to this case. We're not challenging the amount of these lump sum settlements. AIG had a duty to allocate them properly after negotiating the lump sum settlement. So let me ask you a quick question about the Home insurance case that you referred to. I read it, and I'll have to confess I was a little confused by it. It seems to me it's principally a failure-to-settle case, but it also has these sort of adjunct discussions of failing to change trial strategy and things like that. I couldn't quite tell if those were still within the court's discussion under the umbrella of subrogation or if they were somehow sort of like an independent duty existing out there. Oh, yes. And I'm just going to put my cards on the table for you. I find this question of state law very, very close and very, very difficult. It's a principle, I think, that's fairly well settled, but the extension into this context beyond failure to settle seems novel to me. You made a suggestion in your reply brief that perhaps we ought to certify the question, and I don't think that we've heard from your opponent on that, but I guess I'd like to hear what you think about that as sort of a first instance solution here, and then we'll ask the appellee when he stands up as well. That's certainly an option you have. There's two major mistakes that happened here, and you've seized upon the first one. The district court looked at the duty to get the case settled, and they said they got the case settled, so there's no breach. It is a continuing fiduciary duty when a primary insurer controls defense and settlement negotiations. In the Home River case, it looks broadly. It's not just looking at did they get the case settled, yes or no. How did you defend it? And the way the duty is phrased is not the duty to get a case settled. What the Georgia cases say is you have to give the same faithful consideration to the insured's interest as you do your own, and so that can be breached in a number of ways. Here it's by misallocating and reallocating lump sum settlements in a way that was not held to the insured. So I think it would be a perfectly legitimate issue to certify it to the Supreme Court. What Georgia case, if any, holds that not only is there a duty of reaching a settlement, but in post-allocation of that settlement that there's a duty? Can you cite me a Georgia case that says that? Well, the Home v. Wynn case is not an insurance case, but it's a fiduciary duty case about allocation of a settlement. The facts of this case are so specific that it's hard to find a Georgia precedent right on point. Isn't that a powerful reason for not certifying the question? There are certain general principles of Georgia law that we have before us, and it's our job to apply them as best we can, being eerie bound to those general principles to the peculiar facts of this case. It just doesn't strike me as the kind of stuff that would yield the conclusion that we should go to the Supreme Court of Georgia, put them out, and say, give us your opinion about this. I think you can reverse. I don't think you need to certify it, but to answer your question. That is to say there are some general principles of Georgia law that are pretty clearly enunciated that we have no need to go to them to restate those principles. But let me ask you a different question. AIGWC contributed, did they not, substantial pre-settlement funds and lien waivers to the claimants? Yes, that doesn't matter. They had to. Why does that not matter? Why does that not suggest, at least in some part, that there was a reasonable allocation of the total payments between AIGWC and AIGGL? That money was definitely owed. It was water under the bridge. What they were settling at that point in time was future exposures. That water that they, that money that they paid previously, they definitely owed it. There was definitely coverage for it. They weren't going to get it back. At the time they were settling these lump sum settlements and then reallocating them, you have to look at it at that point in time. What are the interests that they are settling then? Nobody was ever going to get that money back that they had spent on medical treatment. What significance should we attach to the fact that Imperial in its own right was perfectly satisfied with this settlement? That's a great point. You're talking about the shoes. We stand in Imperial Sugar's shoes and AIG's argument is that we can't complain because Imperial Sugar didn't complain. First of all, Imperial Sugar was not told about the allocations. They were told about the general liability towards settlements, but they were not told about the allocations. They were not told about changing allocations that had been previously. So you think Imperial is unhappy with the resolution here? I don't think it matters if they're happy. But that's not my question whether it matters or not. The answer to the question matters to me. Is there any record evidence that Imperial was unhappy here? That they thought the settlement was no good because the outlay was no good or the allocation was wrong or anything? Did they ever assert in this record anything that suggested they were not pleased with the resolution? There is no such evidence of that. Why can't it be argued in this case that both the general liability and the workman's payouts were low and they're not operated to Imperial's best interest? Well, you can't argue that because they had a lump sum settlement. At that point in time, AIG's duty to settle is continuing. They could have settled it for the general liability aspect for a lot less than they did. They only settled it for a little bit less than they could. But if they were looking at the bottom line, I'm talking about Imperial now, and the payout was less than it otherwise might have been, they might reasonably have looked at that settlement and said, it's not bad. We'll take it. We're in a tough spot here. Twelve dead, 26 injured, bad accident, a lot of liability. We've gotten out pretty well here. You're right. Couldn't they have reasonably said that? And if the answer to that is yes, doesn't that illuminate the question of whether or not the trial judge made a mistake here? You're right. They were not unhappy with the settlement, but they don't have the right to be happy or not with the settlement. The excess insurers paid for it, and that's the essence of subrogation. And the case we cite, Hartford v. National Assurity v. Hartford that we cited says, you know, the insured has little incentive to sue or to complain in these situations because the harm falls completely on the excess insurer. We paid for those shoes, so we have the right to stand in those shoes and seek our address for the breach of that fiduciary duty. What happened to XL, by the way, the sort of the mid-tier insurer? They burned their limits as fast as they could. But did they have a claim like the one that you have, and did they ever pursue it? They could have. They considered it. They thought it'd be cheaper in the long run just to spend all their money. Thank you. You have reserved three minutes for your rebuttal. Thank you. Good morning, Your Honors. Please, as a court, my name is Michael Tricarico. I'm with the law firm of Kennedy CMK, and I represent the AIG parties in this dispute. I think that what's important here, and we've discussed it already in some respect, is this is a claim that's brought, it's a subrogation claim, and American Guarantee stands in the shoes of Imperial Sugar. There's no, a lot of the argument that I heard from counsel here is focused upon American Guarantee. The trial court correctly concluded, and now they've said, in the state of Georgia, a primary insurer does not have a direct obligation to the excess insurer. That's pretty well established. They made that argument before the lower court. The lower court rejected it, and they've dropped that argument on appeal. So what we're faced with here is a situation where you have to look at Imperial Sugar and the claims that they would have. Imperial Sugar, as the court correctly concluded below, was not harmed. They had no personal liability for this suit, no corporate liability. And that's because, your contention is that's because they had the excess insurance, right? Well, it's not only that. They did have the excess insurance, which prevented them from paying an out-of-pocket loss. But I think you have to look at the bigger picture here. What was the goal of Imperial Sugar? The goal of Imperial Sugar, these were catastrophic cases. And as the record demonstrates, subsequent events have indicated that this was literally a bet-the-company type of case because subsequent verdicts in Georgia for these types of cases have spiraled out of control to the point of where individual claims have been resolved for $100 million. So they had $101 million worth of coverage. Their goal was to settle the cases within that insurance coverage and to avoid any personal liability and any catastrophic liability that they might face that, like I said, is a bet-the-company type of situation. So here, the settlements accomplished that goal. They had approved, the Imperial Sugar Board of Directors, its general counsel, had approved settlements of these claims in the amount of $19.3 million. We ended up settling those claims on the GL side for $16.3 million, $3.2 million less than they had authorized this to. And again, I can't stress enough, these settlements were reasonable. American Guarantee doesn't dispute they were reasonable. They offered no expert testimony to establish they were unreasonable. The only expert testimony in the case comes from an expert, Robert Ingram, that we provided who said, undoubtedly, you settled these claims for one-third of the special damages. That was a tremendously reasonable settlement. The special master and the district court acknowledged this was exemplary lawyering. But if Imperial hadn't had excess coverage, then they would have suffered an out-of-pocket loss, no doubt about it, right? If Imperial had no excess coverage, then yes. If the claims could not be resolved in our layer of coverage, they would have suffered an out-of-pocket loss. So I mean, in some sense, the fact that they didn't suffer an out-of-pocket loss is a direct result of the fact that they had excess coverage. And the reason I'm asking you these questions is I'm trying to figure out, it seems fairly well settled that excess carriers can bring equitable subrogation claims, at least in the failure-to-settle context. And I wonder whether your position is no harm because excess coverage, in effect, means  Well, I'm not saying that excess carriers don't have equitable subrogation rights, but it's certainly not this case because, again, they're in the shoes of the insured. The insured was completely happy with the settlements that were reached. There's nothing in the record to indicate that they were dissatisfied. Again, they had approved settlements on the GL side for a higher amount, and they were settled for $3.2 million less, preserving coverage. And this whole notion that AIG went and rushed and settled these as quickly as they can, well, that's just completely false, and that's not supported by the record. But just so I understand sort of the legal principle, the harm that forms the shoes into which the excess carrier either can or cannot step is judged not by monetary loss, out-of-pocket loss, but by sort of happiness with the result. Well, I don't know if it's necessarily happiness with the result. There is tangible and factual evidence that they got a better result than they had initially approved. So I think that there was monetary savings here. I mean, I think this is a classic example of no good deed goes unpunished. Because the way these settlements worked was there was a workers' comp contribution, there was a general liability contribution. And then what happened is the amount that was contributed by workers' comp was actually subtracted from the general liability contribution. So anything that they paid on workers' comp, they got a deduction on the general liability side. So here we're saving money off of what Imperial Sugar had approved by giving this deduction that we didn't have to give. And now we have American Guarantee purportedly stepping in Imperial Sugar's shoes complaining about that. Really, this is American Guarantee just trying to assert a direct claim against us. Because clearly, we did everything that – we did what was beneficial to Imperial Sugar. And I think that the lower court's opinion at page 13 sums it up best. It says, while AIG may have chosen a settlement allocation scheme that benefited AIG, it did not do so to Imperial Sugar's detriment. AIG is not barred from choosing its optimal settlement allocation from among choices that are equally beneficial to Imperial. Here, we undertook actions to benefit Imperial. And like I said before, this whole notion that we just ran up GL settlements to get out of these cases and avoid paying defense costs is, quite frankly, nonsense. Because we defended these cases for three years. We paid $9 million in defense costs. What we could have done is – they've discussed in their briefing this Manker case, which was a large claim. What we could have done is picked out the largest claimant, gone and settled that claim without even having them sue us. We could have just went to the person with the worst injury and said, here, this is what we'll settle for. We don't incur any defense costs. We're out. But that's not what happened. We defended these cases. We did everything possible to reduce the amount that was authorized by Imperial Sugar. And that's undisputed. Like I said, they don't claim that these settlements were unreasonable. I don't take him really to be disputing that. I mean, it sounds to me like he's concerned really only about the allocations and the effect of the allocations. So you resist the premise of the lower court's statement that you just read us, that this was a self-interested move by AIG to allocate the settlements in the way that it did? I don't think it was self-interested. But even if it was self-interested, what the court is telling us, it doesn't matter. You have to look at the result. And the result clearly is they settled these claims for less than Imperial Sugar had approved. There's no harm to Imperial Sugar. And if you look at it from another aspect, what we could have done is we could have just settled the GL claims for that amount, taken no deduction from the workers' comp component that we paid. And we were perfectly within our rights to do that because Imperial Sugar had approved payment of 19-plus million dollars for this. We could have just gone and settled this and left the workers' comp claims pending. Now, you know, it was also a benefit to Imperial Sugar because, you know, whenever there's a workers' comp case, that's something they're involved in as well. It was a benefit to the attorneys who were handling those cases on behalf of the plaintiffs. I mean, his testimony in the record, Mr. Tate, who's a noted plaintiff's attorney in the state of Georgia, he said that he was happy to get rid of those liens. And they had value to him because he had other parties to pursue claims against. And if those liens aren't taken care of, well, whenever he goes to settle a claim against one of these other parties, these non-Imperial Sugar entities, the liens are hanging over his head because AIG can come in and say, hey, we have a lien and we're entitled to a portion of the recovery. Now, they've made an argument that, oh, those liens wouldn't have been recoverable, but A, we don't know that, and B, they were important to Tate. So those had value. You know, we paid, this notion that we only paid a de minimis sum under workers' compensation is just not supported by the record. If you look at our brief, there's a chart and it shows how much we paid. We paid, I think, $43 million total in workers' comp benefits in this case, a substantial amount. And for them to say, you know, that somehow, you know, we should have taken more on those, it's just, it's their argument and it's not the insured's argument. I guess, I mean, I guess what they say is that both you and the plaintiff's lawyers wanted to load up the GL side because you did, so you could exhaust that wing of the coverage more quickly, and the plaintiff's lawyers did because they take a higher percentage of those. Well, here's the thing. If our incentive was to exhaust the GL side as quickly as possible, why would we have gone into court and made the first argument that there's a workers' comp bar and these claims, these claims should be dismissed outright? Well, presumably, right. I mean, first you wanted to win. Well, but under that circumstance, we still have GL exposure. We're still going to end up paying our limits in GL. And plus, we're going to have a continuing workers' compensation obligation. So correct me if I'm wrong. I thought your argument on the workers' compensation bar was that it would bar not only the workers' comp claims, but that you had this very creative argument that ultimately didn't quite work, but that you were pressing that it would bar the GL claims as well. No. What I'm saying, I think the argument was these workers are limited exclusively to workers' comp recovery. It bars the GL claims. But again, that's not all of the plaintiffs involved in this case. Only a certain percentage of them were actually employees where the workers' comp bar potentially applied. So we went in with a strategy of saying, hey, let's knock these claims out completely. We're still going to have GL exposure. We still would have exhausted our limits because they settled the Manker case for something around $28 million. So to say that there was this strategy to go in and run up the GL payments and avoid so we could avoid paying our workers' comp benefits, it's completely false and not supported by the record. And again, I can't stress this enough, the insured, Imperial Sugar, had approved settlement amounts that were significantly higher. And we went in and we developed this strategy. Again, the special master and the district court exemplary lawyering. We reduced those amounts. We got an amazing settlement. That's the only way to describe it. Twenty-six catastrophic claims for $26 million. An unheard of result. And we did it by getting approval. We got approval of a certain amount and we went and we did better than that. We did better than that for our insured. So for them to come in here and say the insured is unhappy with this because the result impacted its excess coverage, it's just simply not true. It's fictitious, quite frankly. So your position is that once you settled for less than the authority that was given to you, you could sort of allocate these things however you wanted to? Well, yeah. Yeah, I think that's true. I think that, again, as the district court said, you know, we can look out for our own interests as well as long as we're serving the interests of the insured. And we've done that. We've served the interests of the insured. We've gotten them a result that, quite frankly, is less than they authorized. And it set the foundation and it set the table for what they wanted to do. And what that was is resolve all these claims within the $101 million of coverage that they had. And that's exactly what we accomplished. Everyone realized you took these claims to trial and it was a bet-the-company situation. You have catastrophic injuries, people with severe burns, terrible, terrible claims worth significantly more than $101 million that they had in coverage. And the subsequent history of cases in Georgia tell us that. And those were discussed, I think, in the papers. Just a couple of things to point out. This, again, all the cases that they've cited in support of their position are these failure-to-settle cases, almost exclusively. I mean, the Wynn case, which is not an insurance case, a little different. You know, there, the executor completely controlled the settlement, no input from anybody else, unlike here where you had, you know, the plaintiffs were represented by counsel and she just allocated these settlements under an estate as she saw fit without consulting with anybody. So it's really a distinguishable case. But this home insurance case that you asked about before, again, in the context of failure-to-settle. And why are these failure-to-settle cases, why do they hold such a high duty, place a high burden on the insurer, is because you're basically rolling the dice with the insurer's So what do you say in response, I guess, to his argument and my confusion, frankly, about reading home insurance, that it does seem to me principally to be a failure-to-settle case, but it does also seem, at least in that secondary discussion, to sort of range beyond that? Well, it is a failure-to-settle case, but I will say this. One of the points that they raised was a misrepresentation about the policy limits and the appellate court threw that out and they said, no, that's not a valid point. Yes, certainly not. The appellate court, as I recall, said, on these facts, forget about it. But I don't know that the appellate court said that's not a valid theory. Well, I think it was a valid theory because they stand, as far as not knowing, the insured is assumed to know the limits of its own coverage. It should. It has the contract here. You, insurance company, step in the shoes of the insured. The insured is supposed to know what its own coverage is. You know, saying that, mistakenly saying that the terms are one thing when there's something else. That's their responsibility. We're dismissing that claim. But the failure-to-adjust strategy, that all plays into the failure-to-settle because if you look at the case closely, what ended up happening is the claims, these were claims where the individual plaintiffs had been exposed to chemicals and had severe injuries and they had come up with a settlement strategy based upon the claims being tried separately. And they gave a certain value to them. But then the court ruled that the claims were going to be tried together and defense counsel was extremely concerned by that. He raised that notion to the insurance company and said, hey, they're going to try these cases together. That means greater exposure for us because these aren't going to be one-offs. These are going to be three people corroborating each other's stories and all being in the same situation and all playing upon the sympathies of the jury. You have to consider increasing the settlement amount. And the insurance company said, no, we're just going to go with what we had before. So it really does, it's not really an independent thing. It's mentioned as an independent thing, but it kind of ties into really this whole failure-to-settle argument. And that's really, you know, that's really where you see this. I mean, think about the public policy ramifications of a decision of this type if you decide this case in favor of American Guarantee and what they want. You're basically putting an insurance company, a primary insurance company, in an impossible situation. It's either, you know, it's damned if you do, damned if you don't. Well, if I settle, then I have to worry about the excess. If I enter into a good-faith settlement, I have to worry about the excess insurer coming back to me and saying, no, you paid too much. If I don't settle and then they get hit with a huge verdict, well, I should have settled before. So there's a very good reason why these cases are limited in scope to these failure-to-settle cases, because that's really the concern. You're rolling the dice with the insured's money. You're putting your interests well above the insured. You're saying, well, I have a million dollars in coverage. You know, I probably am going to exhaust my coverage, but why don't I roll the dice? Maybe I get lucky and win and the insured doesn't have to pay anything. And then the insured ends up getting hit with a verdict that's uninsured because you've way exceeded the excess layer of coverage. But here, not the case at all. Not the case at all. Okay. I'll tell you what. So as I've held you up here long enough, can you just respond briefly having had the benefit of your opponent's reply brief to my question about certification? Well, I don't think that's – I think that the law existing – that the case law existing in Georgia is sufficient to make a decision on this. I think that the special master in the district court got that correctly – got that correct. I think that they improperly used this certification issue from a procedural standpoint in a reply brief. But, I mean, we could even ask you that at the oral argument. Yeah. Certainly, certainly not. Like I said, I think that the law in Georgia is clear enough on this that the decision that was made below was correct and that you can make that decision without certifying the question to the state court. However, if by some chance you were to decide to certify a question to the state court, certainly not the questions that they've been saying. You know, the federal court would be essentially saying to the state court, you know, we don't want to decide this, so why don't you? Here are all the facts and make a decision on it. So – but again, like I said, I think that state law is clear enough in Georgia as – on this point. And just one last point on that. You know, the American Guarantee has talked about this fiduciary duty that's owed. If you look at the language of the cases, it really doesn't talk about a fiduciary duty. It says – it limits it – and its origins are in the Evans case, which I think that they incorrectly cited in their brief. It's actually a 1967 case. But the language in that case is somewhat of a fiduciary duty. And I think that's picked up in the Whiteside case that they also cite. So it's not even clear that it's actually a fiduciary duty. Counsel, if you could bring your remarks to a conclusion. Yes. It's not even clear that it's a fiduciary duty. But even if it is, I think that we've for a number that was extremely reasonable by all accounts and it was well in line with the settlement strategy that Imperial Sugar had hoped to use in this case and it was well below the number that they approved for these settlements. Thank you much. Thank you. Counsel, you've reserved four minutes – three minutes. Three minutes and I've got five points I'd like to make as quickly as I can. The reference to public policy of getting cases settled. I also believe it was in the Home v. North River case, which awarded the excess insurer the ability to subrogate because of the public policy, not just to get cases settled, but for the prompt and just settlement of cases. So public policy works in our favor, I think. All the references to the facts of this case that AIG did not burn through its policy as fast as possible. Those are very complex issues of fact. I mean, we have one statement in the record by the GL adjuster saying, spend my money, please. I mean, these are questions of fact that the special master should decide and weigh and not rule summary judgment on. We're talking about the producer duty that a primary insurer has. And he referenced no good deed goes unpunished because $19 million were authorized and they settled it for $3.2 million less. Well, that's not satisfying your producer duty if you can get it settled for $5 million less, $10 million less, $20 million less. Their producer duty continues to the end of the case and the end of the settlement. And just so they settled it, but for a little bit less when they had the unilateral power to reallocate these settlements, doesn't mean they accomplished their producer duty. It harmed Imperial Sugar and my client, American Guarantee, paid for that harm. Don't make the mistake that the district court made where it said, yeah, there's evidence that the workers' comp settlements were underpaid, but that doesn't mean that the GL settlements were overpaid. And that's a logical mistake because by that time, this is a lump sum and that's the duty we're analyzing today. It's like a pie chart with two colors. If you reduce one, you're necessarily making the other one bigger. So if one underpays, the other one has to underpay at that point, once the two claims are crystallized in a lump sum settlement. So in a nutshell, those are the two mistakes that the district court made. First, just looking at the duty to settle before the time of the lump sums and not looking at the part that we're criticizing, the duty to complete the settlement after the lump sum and allocating it. And second of all, the mistake of saying that just because there's harm but it's ensured harm, that it doesn't matter. That turns the Justice Marcus' question about certification earlier. It's true that the precise facts of this case probably don't have much precedential value for other cases, but there is a rash of Holt demand cases out there in Georgia for the past five years at least. Those focus on the duty to settle. And a good question to certify, if you feel like certifying, the question is, does the duty, doesn't it primarily concern... Sitting in the area in a diversity case, we simply cannot make hide nor tell out of this case. We just don't know what Georgia law is. It is so unclear. There's no arc of decisions that illuminate the path for us, and we've just got to guess, like shooting blanks in the night. Before we turn around and say to the Georgia Supreme Court, we want you to help us decide this case. You understand. So there's got to be a pretty powerful reason, at least speaking for myself, before we step down the road of asking them to do our work for us. Right. And I'm not asking them to do your work on this case. But to seize upon Judge Newsom's question, to the extent that there's any uncertainty about whether a primary insurer's duty to get a case settled is broader than the duty just to get it settled, do they have a fiduciary duty to control the defense, the settlement, the way the settlement goes, the way the settlement's allocated, everything, and giving the insurer's interest the same faithful consideration as its own interest? Is it extinguished just by getting the case settled, period? Or is it broader than that? And I think the Home v. North River case suggests that it's broader than that. But if you need more guidance, that would be the question to certify. Is the duty limited to just getting it settled, or is it all-encompassing? And the fact that we have this rash of hold-demand cases in Georgia where we have plaintiff attorneys trying to game the system by sending settlement demands for the limits and then getting excess verdicts, they could play on to that duty and what, you know, the extent of what that duty is. So that would provide guidance for a lot of litigation in the State of Georgia, not just this case. Thanks very much, and thank you both. We'll proceed to the third and last case.